# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEW MEXICO

**JANET CAZE**,

       Plaintiff,

   vs.                        No.    **CIV 04-1189 MCA/RHS**

**KEENAN & ASSOCIATES, INC.**,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the ***Defendant Keenan & Associates, Inc.'s Motion for Summary Judgment*** [Doc. 22] filed on July 14, 2005.  Having considered the parties' submissions, the relevant law, and otherwise being fully advised in the premises, the Court grants Defendant's motion and dismisses this action with prejudice for the reasons set forth below.

## I.    BACKGROUND

On October 19, 2004, Plaintiff Janet Caze filed this civil action against her former employer, Defendant Keenan & Associates, Inc.  Plaintiff's *Complaint* alleges that Defendant terminated her employment in violation of Title I of the Americans with Disabilities Act (ADA), 42 U.S.C. §§ 12111 to 12117, and the Age Discrimination in Employment Act (ADEA), 29 U.S.C. §§ 621 to 634.  [Doc. 1.]  On July 14, 2005, Defendants moved for summary judgment on all of Plaintiff's claims.  [Doc. 31.]  The

undisputed facts and evidence of record relating to Defendants' summary-judgment motion can be summarized as follows.

Plaintiff was born on November 8, 1955.  She has had renal disease for over twenty years, which affects the functioning of her kidneys.  Plaintiff began working for Defendant's insurance-claims adjusting and administration business in February 1998.  [Doc. 1, ¶¶ 5, 6, 7; Doc. 5, ¶ 2; Caze Aff. ¶ 2.]  According to the evidence of record, Plaintiff's main duties consisted of clerical and accounting work preparing checks and financial statements for a guaranty fund that Defendant administered.  [Caze Dep. at 26; Peterson Dep. at 5, 12, 14; Keenan Dep. at 26.]

During her employment with Defendant, Gary M. Keenan was the president of the company. In that capacity, he served as Plaintiff's "boss" and had final decision-making authority with respect to hiring, firing, and employee discipline.  [Doc. 1, ¶ 8; Doc. 5, ¶ 2; Peterson Dep. at 8; Keenan Dep. at 28-29, 49.]  Linna Peterson was the company's "comptroller/office manager," and her duties included supervising the company's clerical staff, taking care of day-to-day accounting functions, handling "human resource issues," and advising Mr. Keenan in these areas.  [Peterson Dep. at 3-5, 7-9.]

The evidence of record does not reflect that Defendant had any formal, written employment contract with Plaintiff specifying the circumstances under which her employment could be terminated or her absence from work could be excused.  In addition, Defendant does not have any written personnel policies or manuals, nor have the parties identified any records documenting the specific amount or type of leave to which Plaintiff

was entitled, or claimed to be entitled, under any company policy or procedure in effect during the relevant time period.

In addition, there is no record that Plaintiff ever invoked, or was eligible to invoke, the leave provisions of the Family Medical Leave Act (FMLA), 29 U.S.C. §§ 2601 to 2654, during her employment with Defendant.  FMLA generally applies to employers with "50 or more employees."  29 U.S.C. § 2611(4)(A).  Plaintiff admits in her deposition testimony that Defendant is a "small business."  [Caze Dep. at 39.]  Her *Complaint* [Doc. 1] does not plead an FMLA claim, nor does she plead any claims under state or local law.

Plaintiff did, however, regularly communicate with Ms. Peterson regarding personnel issues, and these communications included requests for leave as well as requests for assistance in handling her workload.  In 2001, Plaintiff advised Ms. Peterson that she had renal disease and alluded to the possibility that someone would need to fill in for her for several months if she ever needed a kidney transplant.  Ms. Peterson in turn advised Mr. Keenan of the need to train another employee to perform some of Plaintiff's duties in the event that Plaintiff had to miss work while obtaining a kidney transplant.  [Caze Dep. at 11-12; Peterson Dep. at 5-6, 9-13, 35-36.]

When Plaintiff felt she needed to reduce her workload or take time off from work, her normal practice was to submit her requests to Ms. Peterson orally or in writing, who would then forward the information to Mr. Keenan as necessary.  Defendant's normal practice was to grant Plaintiff's requests to take time off, and Plaintiff could not identify any instances prior to August 26, 2003, in which Defendant denied such a request or required further

justification from a doctor before approving it.   On several occasions, Defendant also made arrangements to reduce or modify Plaintiff's workload.   [Caze Dep. at 11-12, 18, 30; Peterson Dep. at 13-16, 27-28; 36-37.]

Notwithstanding these accommodations, Mr. Keenan and Ms. Peterson were generally satisfied with Plaintiff's job performance prior to August 26, 2003, and did not have occasion to consider demoting or disciplining her while she was employed by Defendant.  [Keenan Dep. at 48; Peterson Dep. at 22-23.]  Plaintiff never heard Mr. Keenan or other employees say anything negative or derogatory about her medical condition, nor was she aware of any instances in which Defendant denied another employee's request for time off or other accommodations to address a serious medical problem.  [Caze Dep. at 12-13, 21.]

There were, however, occasional disputes or tensions in the workplace regarding other issues.  Ms. Peterson recalled that from time to time Plaintiff would tell her that she was unhappy with her position and that she was applying for jobs with other companies. [Peterson Dep. at 17.]  Other employees also recalled that Plaintiff generally disliked Mr. Keenan [Crane Dep. at 10] and that "sometimes she feels like . . . she just would like to walk out." [Williams Dep. at 17.]  Plaintiff denies making such statements.  [Caze Dep. at 8-10.]

According to Ms. Peterson, the occasions on which Plaintiff would communicate her dissatisfaction with her job usually followed an incident in which Plaintiff had become upset with Mr. Keenan.  Ms. Peterson estimated that there were probably three or four of such incidents involving Plaintiff over the course of her employment, although she could not recall the details as to what provoked Plaintiff's dissatisfaction or how each incident was resolved.

-4-

Ms. Peterson did, however, recall the details of one incident in which other employees had complained about boxes of closed files stacking up in a computer server room, and Mr. Keenan assigned Plaintiff the task of having the boxes sent to storage or returned to their receivers. According to Ms. Peterson, Plaintiff refused to carry out this assignment because she claimed she was too busy, and Ms. Peterson eventually ended up performing the task herself. [Peterson Dep. at 17, 23-27.]

On August 26, 2003, which was about one to three months after the dispute over the boxes of closed files, Plaintiff was feeling tired and dizzy when she came into work in the morning. She had a doctor's appointment the previous day and thought there was a possibility that "this was the end of the kidney." She was afraid of this possibility. Plaintiff wrote some notes on her desk regarding some payments that were due the next day, and then she went to speak to Ms. Peterson. [Caze Dep. at 13-20.]

According to Plaintiff, she told Ms. Peterson: "I'm feeling terrible. I'm going to go to the doctor and see what he says--see what we can do. I don't know when I'll be back." Plaintiff recalls that Ms. Peterson responded by saying: "Well, just let me know what the doctor says and what's happening." Ms. Peterson then asked Plaintiff if she was "okay to drive," and Plaintiff responded: "Yeah, I think I'm okay to drive because when I sit down I'm not as dizzy." [Caze Dep. at 20-21.]

Ms. Peterson recalls this conversation differently. According to Ms. Peterson, Plaintiff initially stated that she had just been on the phone with her doctor's office, and Plaintiff seemed very upset about something her doctor's office had told her. Ms. Peterson

-5-

recalls that Plaintiff then said, without further explanation: "I am leaving and I will not be back." Upon uttering this statement, Ms. Peterson claims that Plaintiff got up to leave and began walking out of the building with her purse and her car keys. Ms. Peterson followed her and asked: "Are you sure you should be driving? Do you need someone to drive you?" Plaintiff responded by insisting that she could drive herself and continued walking away without discussing the matter any further. [Peterson Dep. at 38-46.]

Plaintiff proceeded to drive herself to her doctor's office for an unscheduled visit at which she and her doctor agreed on a plan for surgery to place a catheter in her abdomen so that she could begin peritoneal dialysis. Plaintiff was absent from work the rest of the week and did not return to work thereafter. [Caze Dep. at 28-32; Ex. B to Doc. 24.]

After Plaintiff left her place of employment on the morning of August 26, 2003, Ms. Peterson was under the impression that she had quit her job and would not be returning. Ms. Peterson did not based this impression solely on Plaintiff's statement that she was "not coming back." Ms. Peterson also took into consideration the way that Plaintiff said it, her demeanor, and her previous threats to leave based on her dissatisfaction with her job. [Peterson Dep. at 17, 42-46, 58.]

Ms. Peterson proceeded to advise Mr. Keenan of her conversation with Plaintiff and her impression that Plaintiff had quit. Ms. Peterson met with Mr. Keenan and another employee, Jennifer Crane, later in the day to make arrangements for getting checks out and taking care of other work assignments "that needed to be done right away." On advice from

Ms. Peterson, Mr. Keenan selected Ms. Crane to fill the position that Plaintiff had occupied until that date.  [Keenan Dep. at 35-39, 40-41; Peterson Dep. at 47-49, 55; Ex. F to Doc. 24.]

Later in the day on August 26, 2003, Ms. Peterson also had a discussion with a third employee, Linda Williams, which ended with Ms. Williams trying to call Plaintiff at her home and leave a message for her.  According to Ms. Peterson, she did not hear from Plaintiff until approximately one week to ten days later.  [Peterson Dep. at 47-49.]

Plaintiff has a different recollection with regard to the timing of her next conversation with Ms. Peterson.  According to Plaintiff, she called Ms. Peterson--as well as several of her co-workers--on August 26, 2003, or possibly the next day, and told them that:  "it would be about two weeks."  Plaintiff claims that Ms. Peterson responded by saying:  "Okay, fine," and that her co-workers responded by expressing their hopes that Plaintiff would feel better in the future.  After these conversations, Plaintiff thought that she had taken care of her situation at work and that there was no further need to contact Mr. Keenan, follow up with a written message, or provide medical documentation of her condition or her treatment plan. [Doc. 1, ¶ 15; Caze Dep. at 29-39.]

On Friday afternoon, August 29, 2003, Plaintiff received a note from Ms. Peterson with her paycheck stating that:  "I passed on to Gary [Keenan] what you told me on Tues. morning, that you were leaving and would not be coming back.  Please contact Gary [Keenan] directly if you are under a different impression."  [Ex. I to Doc. 24; Caze Dep. at 39-40.]  According to Plaintiff, she called Mr. Keenan immediately upon receiving this note and told him that she just had surgery the previous day and that she "had never quit."

-7-

Plaintiff claims that Mr. Keenan responded by saying: "We'll see what happens." Although Mr. Keenan did not make any promises of continued employment during this conversation, Plaintiff thought the situation was "straightened up" and that "it would be fine." [Caze Dep. at 40-42.]

Mr. Keenan and Ms. Peterson tell a different story. As noted above, Ms. Peterson's recollection is that Plaintiff did not call her until a week to ten days after August 26, 2003, at which time Plaintiff mentioned something about wanting to come back to work in the future. Ms. Peterson claims that she told Plaintiff that Plaintiff would have to talk to Mr. Keenan directly, but that he was out of town at the time. Ms. Peterson encouraged Plaintiff to leave Mr. Keenan a voice mail message and set up a time to meet with him. [Peterson Dep. at 49, 60-61.]

According to Mr. Keenan, he did not receive Plaintiff's call until "a couple of weeks" after August 26, 2003. During that call, Plaintiff allegedly told Mr. Keenan "she was not in her right mind when she quit and she wanted her job back." Mr. Keenan claims he responded by saying "we will think about it. We will cross that bridge later and that was it." [Keenan Dep. at 41.]

In any event, two weeks passed from Plaintiff's departure on August 26, 2003, and Plaintiff still did not return to work. Plaintiff admits that she did not call in again to report her status to Mr. Keenan or Ms. Peterson after her alleged conversation with Mr. Keenan on or about Friday, August 29, 2003. On September 15, 2003, however, Plaintiff sent an e-mail to Mr. Keenan requesting to meet with him on Wednesday morning, September 17, 2003,

and advising him that "everything should be in order for my return next Monday 9/22/03." [Caze Dep. at 42-45; Ex. 1 to Caze Dep. attached as Ex. 1 to Doc. 22.]

Although Mr. Keenan apparently responded to Plaintiff's e-mail message of September 15, 2003, the evidence of record does not reflect that the meeting she requested ever occurred, and she did not return to work for Defendant at any time thereafter. After having surgery to place the catheter in her abdomen, Plaintiff began peritoneal dialysis on September 13, 2003. Since that date, she has dialysis all night, which interrupts her sleep. She also has dialysis two times each day for about 30 minutes at a time, at around noon and 6:00 p.m. As a result, Plaintiff must limit her daily activities during the time that she is confined to the dialysis machine, and she cannot lift more than 20 pounds because of the risk of dislodging the catheter. [Caze Aff. ¶¶ 3, 7.]

## II.   ANALYSIS

### A.   Standard of Review

Under Fed. R. Civ. P. 56(c), the Court may enter summary judgment when the motion papers, affidavits, and other evidence submitted by the parties show that no genuine issue exists as to any material fact and that the moving party is entitled to judgment as a matter of law. A "genuine issue" exists where the evidence before the Court is of such a nature that a reasonable jury could return a verdict in favor of the non-moving party as to that issue. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248-52 (1986). An issue of fact is "material" if under the substantive law it is essential to the proper disposition of the claim. See id. at 248. Judgment is appropriate "as a matter of law" if the non-moving party has failed to make

an adequate showing on an essential element of its case, as to which it has the burden of proof at trial.  See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986); Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670-71 (10th Cir. 1998).

In order to warrant consideration by the Court, the factual materials accompanying a motion for summary judgment must be admissible or usable at trial (although they do not necessarily need to be presented in a form admissible at trial).  See Celotex Corp., 477 U.S. at 324; Wright-Simmons v. City of Okla. City, 155 F.3d 1264, 1268 (10th Cir. 1998).  "To survive summary judgment, 'nonmovant's affidavits must be based upon personal knowledge and set forth facts that would be admissible in evidence;  conclusory and self-serving affidavits are not sufficient.'"  Murray v. City of Sapulpa, 45 F.3d 1417, 1422 (10th Cir. 1995) (quoting Hall v. Bellmon, 935 F.2d 1106, 1111 (10th Cir.1991)).  Thus, "[h]earsay testimony cannot be considered" in ruling on a summary-judgment motion.  Gross v. Burggraf Constr. Co., 53 F.3d 1531, 1541 (10th Cir. 1995); see also Starr v. Pearle Vision, Inc., 54 F.3d 1548, 1555 (10th Cir. 1995) (applying this rule to inadmissible hearsay testimony in depositions).  In addition, the Court may disregard an affidavit that contradicts the affiant's own sworn deposition testimony if the Court finds that such an affidavit constitutes an attempt to create a "sham fact issue." Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1223 n.2 (10th Cir. 2000) (citing Franks v. Nimmo, 796 F.2d 1230, 1237 (10th Cir. 1986)).

In this case, the parties have submitted exhibits and deposition testimony that contain hearsay and hearsay within hearsay.  In reviewing these materials to determine whether

Defendants are entitled to summary judgment, the Court does not consider statements that affiants or deponents attribute to others for the purpose of proving the truth of the matters asserted therein, except for admissions by a party opponent (or agent thereof) which the affiant or deponent witnessed.  See Fed. R. Evid. 801(d)(2); Wright-Simmons, 155 F.3d at 1268; Pastran v. K-Mart Corp., 210 F.3d 1201, 1203 n.1 (10th Cir. 2000).  The Court does, however, consider statements attributed to third parties for other admissible purposes.  In particular, such statements may be considered for the limited purpose of showing their effect on the listener or the declarant's state of mind.  See Faulkner v. Super Valu Stores, Inc., 3 F.3d 1419, 1434 (10th Cir. 1993) (effect on the listener); Wright v. Southland Corp., 187 F.3d 1287, 1304 n.21 (11th Cir. 1999) (declarant's state of mind); Pastran, 210 F.3d at 1203 n.1 (similar).  They also may be considered as verbal acts or operative facts when legal consequences flow from the utterance of the statements.  See generally Echo Acceptance Corp. v. Household Retail Servs., Inc., 267 F.3d 1068, 1087 (10th Cir. 2001).

Apart from these limitations imposed by the Federal Rules of Evidence, it is not the Court's role to weigh the evidence, assess the credibility of witnesses, or make factual findings in ruling on a motion for summary judgment.  Rather, the Court assumes the admissible evidence of the non-moving party to be true, resolves all doubts against the moving party, construes all admissible evidence in the light most favorable to the non-moving party, and draws all reasonable inferences in the non-moving party's favor.  See Hunt v. Cromartie, 526 U.S. 541, 551-52 (1999).

In this case, Defendant has submitted a page of Plaintiff's deposition testimony with its reply brief.  [Ex. 1 to Doc. 25.]  The general rule is that when a movant submits additional evidence in support of summary judgment after the filing of the non-movant's response, district courts have the option of either disregarding that additional evidence or providing the non-movant with the opportunity to file a surreply.  See Beaird v. Seagate Tech., Inc., 145 F.3d 1159, 1163-65 (10th Cir. 1998).  This rule does not apply here, however, because the page of Plaintiff's deposition testimony submitted with Defendant's reply brief was previously submitted as an attachment to Defendant's motion, and thus Plaintiff already has been afforded an opportunity to respond to this evidence.   [Ex. 1 to Doc. 22.]

### B.    Plaintiff's ADA Claim

To prevail on her ADA claim, Plaintiff must initially establish a *prima facie* case that: "(1) she is a disabled person as defined by the ADA;  (2) she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired;  and (3) her employer discriminated against her because of her disability."  Mackenzie v. City and County of Denver, 414 F.3d 1266, 1274 (10th Cir. 2005) (citing Butler v. City of Prairie Vill., 172 F.3d 736, 748 (10th Cir.1999)).  Plaintiff may use either direct or circumstantial evidence to prove her ADA claim.  See generally Monette v. Electronic Data Systems Corp., 90 F.3d 1173, 1178 (6th Cir. 1996); see, e.g., White v. York Int'l Corp., 45 F.3d 357, 361 n.6 (10th Cir. 1995) (noting that direct evidence is present when "an employer readily acknowledges that the decision to terminate the employee was premised, at least in part, on the employee's disability").

In this case, Plaintiff does not present direct evidence in the form of an admission by Defendant that her employment was terminated because of an actual or perceived disability.[1] Plaintiff acknowledges that she never heard Mr. Keenan or any of Defendant's other employees make any negative or derogatory comments about her medical condition. [Caze Dep. at 12-13, 21.]  In addition, Defendant's stated reasons for the decision to hire another employee to fill Plaintiff's former position were that Mr. Keenan and Ms. Peterson thought Plaintiff had quit her job when she abruptly left on August 26, 2003.  [Keenan Dep. at 35-41; Peterson Dep. at 47-49; Ex. F to Doc. 24.]  According to Defendant, Plaintiff's sudden departure and subsequent absence from work did not call for a decision based on the nature or extent of her disability because Plaintiff did not provide them with a sufficiently detailed and timely explanation of the reasons for her absence during this period.

Although Plaintiff has not presented direct evidence that Defendant made a decision to  terminate her employment based on her disability, she may still rely on circumstantial evidence to prove her ADA claim.  The Court analyzes this claim under the familiar framework first articulated in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973).  See Butler, 172 F.3d at 747; Morgan v. Hilti, Inc., 108 F.3d 1319, 1323 (10th

---

[1]In response to Defendant's motion for summary judgment, Plaintiff points out Ms. Peterson's deposition testimony that she thought Plaintiff's illness was affecting the amount of work that Plaintiff could handle in the months preceding her absence.  [Peterson Dep. at 22-23, 27.]  Nevertheless, Ms. Peterson accommodated Plaintiff's needs during this period by reducing Plaintiff's workload. [Peterson Dep. at 28.]  According to the evidence of record, the effect of Plaintiff's illness on the amount of work that she could handle during the months preceding her absence was not cited by either Mr. Keenan or Ms. Peterson as a reason why she was no longer working.

Cir.1997).   Under this framework, the employee must establish a *prima facie* case of unlawful discrimination in order to survive a motion for summary judgment.  If the employee establishes a *prima facie* case, then the burden of production shifts to the employer to articulate a legitimate, nondiscriminatory reason for the employment decision that is alleged to be unlawful.  If the employer meets this burden, then summary judgment is warranted unless the employee can show that there is a genuine issue of material fact as to whether the reasons proffered by the employer are pretextual or whether her disability was a motivating factor in the employment decision.  See Mackenzie, 414 F.3d at 1274; Hardy v. S.F. Phosphates Ltd. Co., 185 F.3d 1076, 1079-80 (10th Cir.1999).

To meet the first element of Plaintiff's *prima facie* case, she must present admissible evidence that she is a disabled person as defined by the ADA.  "The statute defines disability as either (1) a physical or mental impairment that substantially limits one or more of an individual's major life activities, 42 U.S.C. § 12102(2)(A);   (2) a record of such an impairment, 42 U.S.C. § 12102(2)(B);  or (3) being regarded as having such an impairment, 42 U.S.C. § 12102(2)(C)."  Mackenzie, 414 F.3d at 1275.  To determine whether Plaintiff meets the requirements of 42 U.S.C. § 12102(2)(A), the Court is to:  (1) consider whether Plaintiff's renal disease is a physical impairment, (2) identify the life activity upon which she relies and determine whether it constitutes a major life activity under the ADA, and (3) ask whether the impairment substantially limited the major life activity.  See Bragdon v. Abbott, 524 U.S. 624, 631 (1998).  "[W]hether a claimed affliction constitutes an impairment under the ADA and whether the identified endeavor constitutes a major life activity are

-14-

determinations of law for the court to decide." Poindexter v. Atchison, Topeka & Santa Fe Ry. Co., 168 F.3d 1228, 1230 (10th Cir.1999).

In this case, the parties' motion papers devote little attention to this element of Plaintiff's *prima facie case*. In particular, they provide no admissible expert medical testimony on Plaintiff's renal disease and its alleged effects on her life activities and job duties. Nevertheless, the evidence of record supports a reasonable inference that Plaintiff's renal disease is a physical impairment and that the collateral effects of her daily dialysis treatments impose substantial limits on one or more major life activities. See generally 29 C.F.R. § 1630.2(h)(1), (i), (j) (defining the phrases "physical or mental impairment," "major life activity," and "substantially limits"); see, e.g., Fiscus v. Wal-Mart Stores, Inc., 385 F.3d 378, 380-85 (3rd Cir. 2004) (holding that end-stage renal disease is a "physical impairment" and that the kidney's function of eliminating waste from the blood is a "major life activity" within the meaning of the ADA); cf. Mackenzie, 414 F.3d at 1275 (noting that expert medical testimony is not always necessary to prove the existence of a physical impairment).

I next turn to the second element of Plaintiff's *prima facie* case, *i.e.*, whether she is qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired. With respect to this element, I note that there was no dispute between the parties prior to Plaintiff's departure on August 26, 2003, because the evidence of record indicates that Defendant provided Plaintiff with time off and reductions in her workload to accommodate her medical needs during this period, and Plaintiff has not

identified a single instance in which she was denied such accommodations or subjected to adverse employment action prior to August 26, 2003.

In addition, the evidence of record does not indicate that Plaintiff's former position required heavy lifting or could not accommodate the noontime dialysis schedule identified in her affidavit.  Thus, the Court will assume for purposes of analysis that had Plaintiff returned to work for Defendant in her former position after she began her peritoneal dialysis on September 13, 2003, she would have been qualified, with reasonable accommodation for her daily noontime dialysis, to perform the essential functions of that job.

This assumption does not necessarily mean that Defendant was required to accommodate Plaintiff's absence from work beginning on August 26, 2003, because the ADA's "reasonable accommodation" provisions are written in the present tense, not the future tense.  See 42 U.S.C. § 12111(8); 45 C.F.R. § 1232(i).  These provisions

> "contain no reference to a person's future ability to perform the essential functions of his [or her] position.  To the contrary, they are formulated entirely in the present tense, framing the precise issue as to whether an individual "can" (not "will be able to") perform the job with reasonable accommodations. Nothing in the text of the reasonable accommodation provision requires an employer to wait for an indefinite period for an accommodation to achieve its intended effect.  Rather, reasonable accommodation is by its terms most logically construed as that which, presently, or in the immediate future, enables the employee to perform the essential functions of the job in question."

Duckett v. Dunlop Tire Corp., 120 F.3d 1222, 1226 (11th Cir.1997) (per curiam) (quoting Myers v. Hose, 50 F.3d 278, 283 (4th Cir. 1995)); accord Hudson v. MCI Telecomm. Corp., 87 F.3d 1167, 1169 (10th Cir. 1996).

-16-

Recognizing that the focus of the ADA's "reasonable accommodation" provisions is on the present rather than the future, courts have declined to construe these provisions as requiring employers to accommodate indefinite, prolonged, or unexplained absences from work, even when the employer acknowledges that such absences relate to a disability.  See, e.g., Monette, 90 F.3d at 1187-88.  Courts also have consistently recognized that "physical attendance in the workplace is itself an essential function of most jobs."  Mason v. Avaya Commc'ns, Inc., 357 F.3d 1114, 1119 (10th Cir. 2004) (collecting cases).  Thus, "even when an employee can satisfactorily perform the essential functions of her position, the employee 'must be willing to demonstrate these skills by coming to work on a regular basis.'" because "'a regular and reliable level of attendance is a necessary element of most jobs.'"  Id. at 1120 (quoting Tyndall v. Nat'l Educ. Centers Inc., 31 F.3d 209, 213 (4th Cir.1994)).  When an employee's absence from work is indefinite or unexplained, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation," nor is the employer required to "wait indefinitely for an employee's medical condition to be corrected."  Gantt v. Wilson Sporting Goods Co., 143 F.3d 1042, 1046-47 (6th Cir. 1998); see Taylor v. Pepsi-Cola Co., 196 F.3d 1106, 1110 (10th Cir. 1999) (collecting cases).

On the other hand, even a prolonged absence from work for purposes of medical care or treatment may constitute a reasonable accommodation under the ADA when it is for a definite period that falls within the parameters of an employer's established leave policies and procedures, and the employee provides a satisfactory explanation of the reasons for

-17-

taking such an extended leave.  See, e.g., Rascon v. U S West Commc'ns, Inc., 143 F.3d 1324, 1334 (10th Cir. 1998).  In addition, FMLA generally allows an employee up to twelve weeks of leave for a serious medical condition if the employee follows the proper procedures for requesting such leave at the time of her departure, and the company for which she works falls under the statutory definition of an "employer."  See Smith v. Diffee Ford-Lincoln-Mercury, Inc., 298 F.3d 955, 959, 967 (10th Cir. 2002).

Unlike the facts in Smith, however, Plaintiff did not plead, much less prove, the elements of an FLMA claim, and it is unclear whether Defendant falls under the statutory definition of an "employer."   And unlike the facts in Rascon, the evidence of record in this case does not contain any leave policies or employment contracts defining the circumstances under which Plaintiff was entitled to be absent from work, nor is there evidence that Defendant was supplied with the type of medical documentation at issue in Rascon.

Moreover, Plaintiff acknowledged in her deposition testimony that when she left on August 26, 2003, there were "repetitive payments [that] would have to be made . . . [t]he next day," and that someone would have to be told "[h]ow to do them."  [Caze Dep. at 20.] Similarly, Ms. Peterson testified at her deposition that there was a "busy period" with the guaranty fund on which Plaintiff worked that year, and when Plaintiff left on August 26, 2003, "we had to make sure that the checks got out and the rest of the things that needed to be done right away got taken care of."  [Peterson Dep. at 15-16, 47.]  Thus, the undisputed facts and evidence of record clearly indicate that regular attendance was an essential function

of Plaintiff's job, and that her position necessarily involved tasks which could not be postponed indefinitely until she decided she was ready to return.

For these reasons, I conclude that Plaintiff has not met her burden of coming forward with evidence to show that she was qualified, with or without reasonable accommodation, to perform the essential functions of the job held or desired, from the date of her abrupt departure on August 26, 2003, until September 22, 2003, the date she indicated she was ready to return to work.  It follows from the authorities cited above that the ADA does not require a small business such as Defendant to accommodate an employee's unilateral decision to take four weeks of leave at a time of her own choosing and with little or no advance notice, explanation, or medical documentation as to the reasons for her absence, where such absence significantly impacts the employee's time-sensitive job functions, and the employee has no contractual right to take this type and amount of leave without the employer's permission.

In the alternative, I also conclude that Plaintiff has not satisfied the third element of her *prima facie* case under the ADA, *i.e.*, that her employer discriminated against her because of her disability.  The ADA defines the term "discrimination" in terms of five specific categories of prohibited conduct, see 42 U.S.C. § 12112(b), (c), (d), as well as a general rule that:  "No covered entity shall discriminate against a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §

12112(a).  The violation alleged in Plaintiff's *Complaint* [Doc. 1, ¶ 28] falls under the general rule prohibiting discrimination in regard to "the hiring, advancement, or discharge of employees," rather than the other, more specific prohibitions in the statute.

In this context, "to establish the third element of a prima facie case of disability discrimination, the plaintiff must show that she was terminated because of her disability, or that the employer terminated the plaintiff 'under circumstances which give rise to an inference that the termination was based on her disability.'" Butler, 172 F.3d at 748 (quoting Morgan, 108 F.3d at 1323).  "This showing 'requires the plaintiff to present some affirmative evidence that disability was a determining factor in the employer's decision.'" Id. (quoting Morgan, 108 F.3d at 1323).

In its motion for summary judgment, Defendant asserts that Plaintiff cannot satisfy this element of her prima facie case for two reasons:  (1) because her employment ended as a result of her own voluntary resignation rather than as a result of any adverse action by Defendant, and (2) because the circumstances in which her employment ended do not give rise to an inference of unlawful discrimination.  [Doc. 22, at 6-7.]  While Plaintiff may dispute the issue of whether she ever intended to voluntarily end her employment, I conclude that the evidence of record does not support a reasonable inference that Defendant terminated her employment because of her disability.

The Tenth Circuit has held that ten months is too long a time lapse to support an inference of a causal connection between the disclosure of an employee's disability to her employer and her termination, especially when the employer repeatedly granted time off

-20-

from work and other accommodations between the date of the disclosure and the date of the termination. See Bones v. Honeywell Int'l., Inc., 366 F.3d 869, 879 (10th Cir. 2004). In this case, Plaintiff admits that she first disclosed some information about her renal disease to Ms. Peterson (who in turn mentioned it to Mr. Keenan) in 2001, more than one year before the termination of Plaintiff's employment at the end of August 2003. During that one year period, the evidence of record indicates that Defendant routinely granted Plaintiff's leave requests and made other accommodations to reduce her workload. "Such accommodating behavior and lack of temporal proximity between [the employee's] termination and [the employer's] first awareness of her [medical condition] do not support an inference of discrimination on the basis of her alleged disability." Id. Moreover, there is no evidence that Mr. Keenan, Ms. Peterson, or any of Defendant's other employees ever said anything negative or derogatory about Plaintiff's medical condition.

In order to withstand a motion for summary judgment on her ADA claim, Plaintiff is required to present admissible evidence which supports a reasonable inference that her employment was terminated *because* she has a disability. Viewing the evidence of record in the light most favorable to the non-movant, the most that she has proved is that she lost her job *while* she had a disability. Therefore, Defendant is entitled to summary judgment on Plaintiff's ADA claim.

I also conclude, in the alternative, that even if one assumes for purposes of analysis that Plaintiff has satisfied all three elements of a *prima facie* case of disability discrimination, Defendant has articulated facially legitimate, nondiscriminatory reasons for the actions Mr.

-21-

Keenan and Ms. Peterson took regarding Plaintiff's employment.  At the time they hired another employee to fill her position, Mr. Keenan and Ms. Peterson were operating under the premise that Plaintiff had carried out her previous threats to quit her job, and by the time Plaintiff advised them that she was ready to come back to work, they had already filled the position she had vacated.  Even if one credits Plaintiff's deposition testimony that she advised Ms. Peterson "it would be about two weeks," [Caze Dep. at 32], it is undisputed that she did not meet that two-week timetable, and there remained a period of at least a week thereafter when Defendant received no communication from Plaintiff or her doctor as to when and under what conditions she might want to return to work.

Further, the evidence of record indicates that Plaintiff's alleged communications to Mr. Keenan or Ms. Peterson between August 26, 2003, and August 29, 2003, were lacking in detail with respect to the nature and extent of her disability or precisely what accommodations, if any, were at issue.  As noted above, "[t]he employer is not required to speculate as to the extent of the employee's disability or the employee's need or desire for an accommodation." Gantt, 143 F.3d at 1046-47.  Courts also have recognized that it is not unreasonable for employers to refuse to accommodate an employee's absences from work when they are indefinite, prolonged, or unexplained.  See Mason, 357 F.3d at 1119 (collecting cases).  Such "unscheduled absenteeism" may provide a legitimate, non-discriminatory reason for an employee's termination. Morgan, 108 F.3d at 1324.  The fact that there are no vacancies to fill also provides a legitimate, nondiscriminatory reason for refusing to hire or rehire a person who desires employment. Cf. Anderson v. Coors Brewing

-22-

Co., 181 F.3d 1171, 1177 (10th Cir. 1999) ("Defendant is under no obligation to change the structure of its business or create a new position for Plaintiff.").

Because Defendant has come forward with legitimate, nondiscriminatory reasons for its employment decisions, it becomes Plaintiff's burden to show that these reasons are pretextual or that Plaintiff's disability was nevertheless a motivating factor in Defendant's alleged decision to terminate her employment.  See Mackenzie, 414 F.3d at 1274.  I conclude that Plaintiff has not met her burden of showing such a genuine issue of material fact.

A plaintiff in an ADA case can show pretext by presenting evidence that the reasons proffered by the employer are so weak, implausible, inconsistent, incoherent, or contradictory as to support a reasonable inference that the employer did not act for those reasons.  See Morgan, 108 F.3d at 1323.  In particular, such pretext may be shown by evidence concerning the "prior treatment of plaintiff; the employer's policy and practice regarding minority employment (including statistical data); disturbing procedural irregularities (e.g., falsifying or manipulating hiring criteria); and the use of subjective criteria."  Simms v. Okla. ex rel. Dep't of Mental Health & Substance Abuse Servs., 165 F.3d 1321, 1328 (10th Cir. 1999).  Pretext also may be shown:

> (1) with evidence that the defendant's stated reason for the adverse employment action was false; (2) with evidence that the defendant acted contrary to a written company policy prescribing the action to be taken by the defendant under the circumstances; or (3) with evidence that the defendant acted contrary to an unwritten policy or contrary to company practice when making the adverse employment decision affecting the plaintiff.

Kendrick, 220 F.3d at 1230 (citations omitted).  In addition, statements by a decision-maker that evince a discriminatory motive for an employment action may be used to show pretext under the McDonnell Douglas framework so long as there is some nexus between the statements and the employment action taken against the employee.  See English v. Colo. Dep't of Corr., 248 F.3d 1002, 1010 (10th Cir. 2001); McKnight v. Kimberly Clark Corp., 149 F.3d 1125, 1129 (10th Cir. 1998).

In this case, Plaintiff admits that neither Mr. Keenan nor his other employees made negative or derogatory statements about her medical condition, and the evidence of record regarding her prior treatment indicates that Defendant accommodated her needs for more than a year after Mr. Keenan, Ms. Peterson, and other employees had been advised of the general nature of her illness.  Plaintiff also presents no statistical data or other evidence suggesting that Defendant engaged in any past practice or pattern of mistreating its disabled employees, nor has she shown that the termination or failure to rehire her was contrary to the terms of any written or unwritten personnel policy or employment contract.  Finally, there has been no showing that Defendant falsified, destroyed, or otherwise manipulated its employment records in order to cover up an unlawful discriminatory animus.  Insofar as an employee's absence from work or failure to explain such an absence are objectively verifiable events, one cannot infer that Defendant was using wholly subjective criteria in its employment decisions.  See Tran v. Trs. of the State Colls., 355 F.3d 1263, 1270 (10th Cir. 2004).

-24-

In lieu of presenting evidence regarding these other factors to show pretext, Plaintiff mainly relies on her contention that Defendant supplied a reason for not allowing her to return to work that is false or implausible, *i.e.*, that Defendant claimed she had quit her job when in fact she had no intention of quitting.  As noted above, I agree with Plaintiff that there are disputed issues of fact concerning what Plaintiff's actual intentions were when she left work on August 26, 2003, and did not return to the workplace thereafter.  Resolving all of this disputed evidence in the light most favorable to Plaintiff, it is possible to infer that she did not intend to voluntarily relinquish her employment at that time.

It does not follow, however, that there are disputed issues of *material* fact as to whether Defendant's stated reasons for its actions are merely a pretext designed to cover up a motive that is based on Plaintiff's actual or perceived disability. When assessing a contention of pretext, the Court examines the facts "'as they appear to the person making the decision to terminate [the] plaintiff.'"  Selenke v. Med. Imaging of Colo., 248 F.3d 1249, 1261 (10th Cir. 2001) (quoting Kendrick, 220 F.3d at 1231).  "[I]t is the manager's perception of the employee's performance, and not the employee's subjective evaluation of her performance, that is relevant in determining pretext."  Id. (citing Shorter v. ICG Holdings, Inc., 188 F.3d 1204, 1209 (10th Cir. 1999)).

Moreover, the Rules of Evidence do not permit Plaintiff to introduce her own self-serving hearsay for the purpose of proving the truth of the matters asserted therein.  Rather, Plaintiff's testimony regarding what she allegedly told Ms. Peterson and Mr. Keenan is considered for the limited purpose of showing its effect on the listener, *i.e.*, what information

-25-

about Plaintiff's future plans or medical needs was actually disclosed to Defendant.  See Faulkner, 3 F.3d at 1434.

For these reasons, the focus of the Court's pretext inquiry is on Defendant's intentions, not those of the Plaintiff.  Further, the strength or weakness of Defendant's stated reasons for its actions is to be determined from the information that was actually available to Defendant, not from subjective intentions or other information (such as medical documentation) that Plaintiff had not disclosed to Defendant at the time the decision was made.  See Tran, 355 F.3d at 1268-69 (noting that an employee's subjective feelings cannot be used to establish pretext where there is no evidence that they were communicated to the employer in a timely manner).

In this case, the evidence of record indicates that Mr. Keenan, in his capacity as president of the company, was the person who had the authority to make the decision whether to hire another employee to fill Plaintiff's former position.  [Doc. 1, ¶ 8; Doc. 5, ¶ 2; Peterson Dep. at 8; Keenan Dep. at 28-29, 49.]  The information communicated to him on August 26, 2003, was that Plaintiff had quit her job.  [Keenan Dep. at 35-38.]  He did not receive information from Plaintiff indicating that she wanted her job back until August 29, 2003, at the earliest [Caze Dep. at 40; Keenan Dep. at 41], and Plaintiff did not inform him that she was actually prepared to return to work until her e-mail of September 15, 2003, which indicated that she would be ready to return a week later on September 22, 2003 [Ex. 1 to Caze Dep. attached as Ex. 1 to  Doc. 22].  By the time Plaintiff indicated that she was prepared to return to work, Mr. Keenan had already hired another employee to fill Plaintiff's

-26-

former position and, therefore, could not offer the position to Plaintiff.  [Keenan Dep.at 40-41.]

Mr. Keenan's explanation is not implausible or unworthy of belief given the information that was available to him during the relevant time period.  If the Court were to second-guess his decision-making, then perhaps he could be faulted for not doing more to immediately investigate the reasons for Plaintiff's abrupt departure on August 26, 2003, and her subsequent absence.  Perhaps he also could be faulted for not establishing written policies and procedures which might have provided Plaintiff with better notice of what was expected of her.  But these faults do not support a reasonable inference that his decisions were based on an unlawful discriminatory animus.

The Court's role in evaluating a motion for summary judgment in this context is not to "second guess the business judgment of the employer."  Selenke, 248 F.3d at 1261 (citing Simms, 165 F.3d at 1330).  Thus, "[a]n articulated motivating reason is not converted into pretext merely because, with the benefit of hindsight, it turned out to be poor business judgment."  McKnight, 149 F.3d at 1129.  Evidence that Mr. Keenan was simply wrong or mistaken in concluding that Plaintiff had quit her job or in hiring another employee to fill her former position is not sufficient to show that Defendant's reasons are pretextual because the material issue in disputed is "whether discriminatory animus motivated the employer, not whether the employer is wise, shrewd, prudent, or competent."  Fuentes v. Perskie, 32 F.3d 759, 765 (3d Cir. 1994).  "'[T]he pertinent question in determining pretext is not whether the employer was right to think the employee engaged in misconduct, but whether that belief was

genuine or pretextual.'" Pastran, 210 F.3d at 1206 (quoting Hardy, 185 F.3d at 1080). "The test is good faith belief." McKnight, 149 F.3d at 1129.

Plaintiff attempts to undermine the plausibility of Mr. Keenan's stated reasons for his decision by invoking a "cat's paw" theory, under which the decision-maker may be held responsible for the actions of a subordinate employee, in this case Ms. Peterson. See English, 248 F.3d at 1011 (collecting cases that recognize the "cat's paw" theory). "To recover under this theory, the plaintiff must show 'that the decisionmaker followed the biased recommendation [of a subordinate] without independently investigating the complaint against the employee.'" Id. (quoting Stimpson v. City of Tuscaloosa, 186 F.3d 1328, 1332 (11th Cir.1999)).

Plaintiff's attempted reliance on a "cat's paw" theory fails in this case for two reasons. First, "[a] plaintiff cannot claim that a firing authority relied uncritically upon a subordinate's prejudiced recommendation where the plaintiff had an opportunity to respond to and rebut the evidence supporting the recommendation." Id.  In this case, Ms. Peterson expressly gave Plaintiff the opportunity to contact Mr. Keenan directly in the note that Plaintiff admits she received with her paycheck on August 29, 2003.  Thus, Mr. Keenan was not blindly relying on the advice of Ms. Peterson as of that date, nor was Ms. Peterson attempting to prevent Plaintiff from contacting Mr. Keenan directly.

Second, and more importantly, it is of no consequence whether Mr. Keenan initially relied on the advice of Ms. Peterson unless Plaintiff can show that such advice was itself biased or pretextual.  Here there is no evidence that Ms. Peterson harbored an unlawful

-28-

discriminatory animus against Plaintiff because of her disability.  For purposes of analyzing the issue of pretext, the main difference between Mr. Keenan and Ms. Peterson is that Ms. Peterson directly witnessed Plaintiff's abrupt departure on August 26, 2003, while Mr. Keenan did not.  Further, the main discrepancy between Plaintiff's version of this incident and that offered by Ms. Peterson is that Ms. Peterson understood Plaintiff to be saying "I am not coming back," while Plaintiff's recollection is that she said, "I don't know when I'll be back."  According to Plaintiff's own testimony, Ms. Peterson did not indicate her disapproval or say anything negative or derogatory in response to Plaintiff's statements on that date or thereafter.  Rather, Plaintiff recalls that Ms. Peterson's initial response was to tell her to "just let me know what the doctor says."  [Caze Dep. at 20-21.]

Plaintiff did not, however, provide Ms. Peterson with medical information from her doctor.  Even when viewed in the light most favorable to Plaintiff, the evidence of record concerning the content of her communications with Ms. Peterson is sparse and indefinite. Plaintiff claims that prior to leaving on August 26, 2003, she said, "I don't know when I'll be back."  [Caze Dep. at 21.]  Even if one credits her deposition testimony that she called Ms. Peterson later the same day or the next day and said, "it would be about two weeks," [Caze Dep. at 32], the evidence of record does not show that Plaintiff provided Ms. Peterson with any information from her doctor or any detailed explanation of the reasons for her absence during those two weeks.  Moreover, the fact remains that she did not return in "about two weeks," and her later communications estimated that she would not be ready to return

to work until September 22, 2003, approximately four weeks after she abruptly left the workplace on August 26, 2003.  [Ex. 1 to Caze Dep. attached as Ex. 1 to Doc. 22.]

Given the Tenth Circuit precedent that requires this Court to examine the facts as they appear to the manager rather than according to the employee's subjective evaluation of her own performance, see Selenke, 248 F.3d at 1261; Kendrick, 220 F.3d at 1231, I cannot conclude that Ms. Peterson's version of the August 26, 2003, incident is implausible or unworthy of belief.  While Ms. Peterson may have been mistaken in her perception that Plaintiff left with the intention of not coming back, such a mistaken perception alone does not support a reasonable inference that it was merely a pretext for the type of discrimination prohibited by Title I of the ADA.  As noted above, there is nothing else in the record to support such an inference by way of negative or derogatory statements, failure to accommodate prior leave requests or workload reductions, violation of written or unwritten company policies, statistical data, or the like.  "'[M]ere conjecture that [the] employer's explanation is a pretext for intentional discrimination is an insufficient basis for denial of summary judgment.'"  Morgan, 108 F.3d at 1323 (quoting Branson v. Price River Coal Co., 853 F.2d 768, 772 (10th Cir.1988)).

For all of the above reasons, I conclude that Plaintiff has failed to establish a *prima facie* case of discrimination under the ADA and,  in the alternative, she has failed to establish a genuine issue of material fact as to whether Defendant's actions were pretextual. Therefore, Defendant is entitled to summary judgment on Plaintiff's ADA claim.

C.   **Plaintiff's ADEA Claim**

The ADEA prohibits an employer from "fail[ing] or refus[ing] to hire or to discharge any individual or otherwise discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's age." §29 U.S.C.  623(a)(1).  See Mackenzie, 414 F.3d at 1276-77.  In order to establish a *prima facie* case of discrimination under the ADEA, Plaintiff must present admissible evidence that  "(1) she was a member of a protected class, (2) she was disciplined, and (3) she was treated differently than similarly-situated non-protected employees for the same or similar conduct."  Id. at 1277.  If Plaintiff establishes these elements of her *prima facie* case, then her claim is considered under the McDonnell-Douglas burden-shifting framework previously articulated in the discussion of her ADA claim.  See Mackenzie, 414 F.3d at 1277; Hazen Paper Co. v. Biggins, 507 U.S. 604, 612 (1993) (noting that the McDonnell Douglas proof standard applies to ADEA claims).

In this case, it is undisputed that Plaintiff was born on November 8, 1955, and is therefore a member of the class of employees protected by the ADEA.  [Doc. 1, ¶ 7; Doc. 5, ¶ 2.]  Her response to Defendant's motion for summary judgment, however, fails to address any of the other elements of her ADEA claim.  In particular, Plaintiff points to no evidence or authority concerning how Defendant's treatment of her compares to the company's treatment of other similarly situated younger employees who engaged in similar conduct.  Plaintiff also points to no evidence or authority which could support a reasonable

-31-

inference that Defendant's stated reasons for its actions were merely a pretext for age discrimination.

According to the Tenth Circuit, "the requirement that the nonmovant specifically reference facts in its motion materials and the record is of special importance in an employment discrimination case." Adler, 144 F.3d at 672. Because Plaintiff's response to Defendant's motion for summary judgment entirely fails to address her ADEA claim, this claim is deemed abandoned, and Defendant is entitled to summary judgment. See Tran, 355 F.3d. at 1266.

## III.   **CONCLUSION**

For the foregoing reasons, the Court concludes that Defendant is entitled to summary judgment, and all of Plaintiff's claims must be dismissed with prejudice.

**IT IS, THEREFORE, ORDERED** that *Defendant Keenan & Associates, Inc.'s Motion for Summary Judgment* [Doc. 22] is **GRANTED**.

**IT IS FURTHER ORDERED** that this action is **DISMISSED WITH PREJUDICE** as to all claims.

**IT IS FURTHER ORDERED** that the **PRETRIAL CONFERENCE** set for TUESDAY, November 1, 2005, at 9:00 a.m., the **CALL OF THE CALENDAR** set for THURSDAY, December 8, 2005, at 9:00 a.m., and the **JURY SELECTION/TRIAL** set for TUESDAY, December 13, 2005, at 9:00 a.m. are hereby **VACATED**.

**SO ORDERED**, this 27th day of October, 2005, in Albuquerque, New Mexico.

**M. CHRISTINA ARMIJO**
United States District Judge